EXHIBIT "A"

## ASSET PURCHASE AGREEMENT

This ASSET PURCHASE AGREEMENT ("Agreement") is made and entered into as of **December 1, 2008**, (the "Closing Date") by and between, **Camelot Hair Care Products, LLC**, a Florida Limited Liability Company ("Seller") conducting business in Ft. Pierce, Florida; and **Robanda International Inc**, a California Corporation ("Buyer") conducting business in San Diego California, all of which may be collectively referred to as ("the Parties").

### RECITALS

A. Seller is engaged in the business of the sale and distribution of various hair care products, which operates under the names "Camelot Hair Care Products, LLC and (and DBA The Marilyn Brush Company; DBA Marilyn Brush, and DBA Chair Talk (the "Business") in the State of Florida conducting business in Ft. Pierce, Florida.

B. Buyer desires to purchase from Seller certain assets of Seller related to the Business, including the inventory, goodwill, product distribution rights, and other assets of the Business listed in this Agreement.

C. Subject to the terms and conditions contained in this Agreement, Seller desires to sell to Buyer, and Buyer agrees to purchase from Seller, certain assets of Seller related to the Business.

NOW, THEREFORE, in consideration of the mutual covenants, representations, and warranties contained in this Agreement, the parties agree as follows:

### ARTICLE 1.
### PURCHASE AND SALE OF ASSETS

**1.1 Recitals Part of Agreement.** The Recitals are incorporated into and are a part of this Agreement.

**1.2. Purchase and Sale of Assets.** Seller agrees to sell to Buyer, and Buyer agrees to purchase from Seller at Closing all of Seller's right, title, and interest in and to all of the assets identified herein and on the attached Schedule 1 and designated as (the "Assets"), with the following limitations:

(a) All customer lists, customer files, accessories, equipment, inventory, and any other property listed on the Asset List;

(b) All contracts, agreements, license agreements, assignments, web site, domain name and related access, warranties, and other rights or agreements, listed on Schedule 2(the "Contracts");

(c) All rights, title, and interest in and to the trade names, logos, copyrights, service marks, trademarks, (with limitations as identified in section 1.2) licenses, and goodwill associated with the Business listed on Schedule 3(the "Intangible Property").

**1.3. Transfer of Purchased Assets.** Five (5) years after the closing date, Seller will assist Buyer in any manner necessary for the transfer to Buyer of the ownership of the assets, contracts and commensurate rights, trade names, logos, copyrights, service marks, and trademarks. During this five (5) year term Buyer shall license all rights for use and distribution thereof under a separate agreement attached as Exhibit 1 and described Trademark License for their exclusive and uninterrupted use. Five (5) years after the Closing Date and upon completion of the payments as specified in Article 3, Buyer shall own outright, without limitation, all such rights, titles and interests identified herein.

**1.4. Excluded Assets.** Any Assets not specifically identified herein, or listed on the attached schedule shall be executed from this transaction and shall remain the property of Seller.

**1.4. Permitted Liens.** Seller shall convey title of the Assets to Buyer free and clear of all liens, security interests, and encumbrances of any kind or nature, other than those items listed on Schedule 4(the "Permitted Liens").

**1.6. Risk of Loss.** Seller assumes all risk of loss or damage to the Assets prior to the Closing. In the event there is any material loss or damage to all or any portion of the Assets prior to the Closing, Buyer may either terminate this Agreement pursuant to Article 12, or negotiate with Seller for a proportionate reduction in the Purchase Price to reflect the loss or damage. For the purposes of this provision, the term "material loss or damage" shall mean any loss or damage to the Assets with an aggregate cost of $250,000.

## ARTICLE 2.
## ASSUMPTION OF LIABILITIES

**2.1. Assumption of Liabilities.** Effective as of the Closing Date (as defined below), and in addition to any other liabilities expressly assumed by Buyer under this Agreement, Buyer shall assume responsibility for the performance and satisfaction of all of the executory obligations and liabilities of Seller listed on Schedule 5 (the "Assumed Liabilities").

**2.2. Excluded Liabilities.** Seller shall retain ownership for all existing not referenced in this agreements, as well as accounts payable of the business. Except as expressly provided in this Agreement, Buyer shall not assume or become liable for any obligations, commitments, or liabilities of Seller, whether known or unknown, absolute, contingent, or otherwise, and whether or not related to the Assets, including, without limitation, any employment, business, sales, or use tax relating to Seller's operation of the Business and use and ownership of the Assets prior to the Closing.

## ARTICLE 3.
## PURCHASE PRICE

**3.1. Purchase Price.** The purchase price to be paid by Buyer to Seller for the Assets (the "Purchase Price") shall be as follows:

3.1.1   Upon execution of this Agreement Buyer shall pay Seller the total amount of One Hundred Fourteen Thousand, Four Hundred Fifty Dollars and 62/100 ($114,450.62,) which represents the current value of the inventory. Two separate payments shall be made to Sellers.
    a.   A payment in the amount of $9284.12 shall be paid on Sellers behalf directly to lien holder, Presidential Financial Corporation
    b.   A payment in the amount of $105,166.50 shall be paid directly to the Seller.

Asset Purchase Agreement
Buyer: Robanda International
Seller: Camelot Hair Care Products, LLC
Page 2 of 13
November 29, 2008 (draft 4)



**3.2. Payment of Purchase Price.** Buyer shall make the payments referenced in Article 3 herein upon execution of this and all associated agreements attached hereto

**3.3. Tax Effect.** The parties agree to abide by the allocation of the Purchase Price specified in this Agreement, and agree to report the transaction as so allocated for income tax purposes.

## ARTICLE 4.
## CLOSING

**4.1. Time and Place of Closing.** The closing for the purchase and sale of the Assets (the "Closing") shall be held at San Diego California or at such other time and place as the parties may mutually agree in writing (the "Closing Date"). At Closing, Buyer shall send by wire transfer the payments as specified in Section 3.1.1 herein. Seller shall immediately thereafter ship, transfer and convey title to the Assets to Buyer as provided in this Agreement.

**4.2. Seller's Closing Obligations.** At the Closing, Seller shall execute, acknowledge, and deliver, as appropriate, each of the following items:

(a) A duly executed bill of sale (the "Bill of Sale"), in substantially the form attached as Exhibit 3 and incorporated by reference, conveying all of Seller's right, title, and interest in any Personal Property which may be included.

(b) A duly executed assignment of contracts (the "Assignment of Contracts") in substantially the form attached as Exhibit 4 and incorporated by reference, pursuant to which Seller shall assign to Buyer all of its right, title and interest in and to, and Buyer shall accept and assume all of Seller's obligations in respect of the Contracts.

(c) A duly executed assignment of intangible property (the "Assignment of Intangible Property") in substantially the form attached as Exhibit 5 and incorporated by reference, assigning all of Seller's right, title, and interest in the Intangible Property to Buyer.

(e) All other deeds, bills of sale, motor vehicle titles, warranty deeds, assignments, endorsements, licenses, and other good and sufficient instruments and documents of conveyance and transfer as shall be necessary and effective to transfer, convey, and assign to Buyer at the Closing all of Seller's right, title, and interest in and to the Assets, free and clear of any liens or encumbrances other than the Permitted Liens, as required by the terms of this Agreement.

(f) Seller shall immediately upon the closing date, arrange for the filing of and provide a copy of the UCC-1 release and Certificate of Release related to the lien holder Presidential Financial Corporation

**4.3. Buyer's Closing Obligations.** At the Closing, Buyer shall execute, acknowledge, and deliver, as appropriate, each of the following items:

(a) Executed counterparts of any documents required to be signed by Buyer pursuant to this Agreement, including, but not limited to, the Assignment of Contracts and Assignment of Trademark.

(b) All other instruments and documents necessary to consummate the transactions contemplated by



Asset Purchase Agreement
Buyer: Robanda International
Seller: Camelot Hair Care Products, LLC
Page 3 of 13
November 29, 2008 (draft 4)

this Agreement.

(c) Produce copies of all intellectual property certificates subject to this agreement.

**4.4. Expenses of Closing.** The expenses of Closing shall be paid as follows:

(a) Seller shall pay all sales and use taxes arising out of the transfer of the Assets, if any.

(b) Except as otherwise expressly provided in this Agreement, all other Closing fees and costs, including, but not limited to, accounting fees, consulting fees, and other incidental expenses in connection with the transactions contemplated by this Agreement shall be borne by the party that incurs the expenses. This provision shall exclude the legal fees associated with the drafting of this and other legal documents as specified in section 14.6 of this agreement.

**4.5. Proration of Expenses.** Except as otherwise expressly provided in this Agreement, all expenses associated with the Assets being conveyed to Buyer, or this transaction, shall be apportioned ratably between the parties as of the Closing Date on the basis of a 30-day month. This obligation to make apportionments shall survive the Closing.

## ARTICLE 5.
## REPRESENTATIONS AND WARRANTIES OF SELLER

**5.1. Seller's Representations and Warranties.** Seller makes the following representations and warranties to Buyer, each of which is true and correct as of the date of this Agreement, and will be true and correct as of the Closing Date:

(a) Seller is a Limited Liability Company, duly organized, validly existing, and in good standing under the laws of the state of its organization, and is qualified to transact business in the State of Florida.

(b) Seller has full legal power and authority to enter into and perform this Agreement, and this Agreement constitutes the valid and binding obligation of Seller, enforceable in accordance with its terms.

(c) The execution and delivery of this Agreement does not conflict with, violate, or constitute a default under the terms, conditions, or provisions of any agreement or instrument to which Seller is a party, or any law, judgment, or order of which Seller is aware, and will not result in the creation of any lien, security interest, or encumbrance on any of the Assets.

d) Except as identified in "Litigation in Progress" to this document as Schedule 6, there are no actions, suits, proceedings, or claims now pending, or, to the best of Seller's knowledge, threatened against Seller or the Assets that would affect Seller's ability to fulfill its obligations under this Agreement or that would impair the value of the Assets.

(e) Seller has, and will have at Closing, good and marketable title to the Assets free and clear of all liens, charges, and encumbrances other than the Permitted Liens and Litigation in Progress.

(f) Seller has provided Buyer with true and correct copies of all Contracts. To Seller's knowledge, all of the Contracts are in full force and effect, have been duly executed by the parties, and neither Seller nor any other party is in default under any Contract.

(h) Seller has provided Buyer with true and correct copies of all documents evidencing Seller's rights in the Intangible Property. To Seller's knowledge, each agreement, instrument, or license with respect to



the Intangible Property is in full force and effect, and neither Seller nor any other party is in default under any such agreements.

(l) Seller is not a party to, or otherwise bound by, any employment contracts, collective bargaining agreement, multi-employer pension fund, or other labor union agreement with respect to any persons employed by Seller in connection with its operation of the Business.

**5.2. Continuation of Trademark Infringement Litigation.** Seller warrants that it shall diligently pursue all aspects of the ongoing infringement of the "Marilyn Trademark" owned by Seller and/or assigned and transferred under this or other associated agreements. Seller shall bear all costs associated with any and all continuing litigation.

**5.3. Adverse Actions.** If any unknown or undisclosed adverse actions are commenced or executed against Seller, or Buyer as a consequence of this transaction, Buyer shall be authorized under this agreement to reduce the quarterly payments by the amount of any expenses, costs, fees or charges incurred. Buyer shall provide seller with a summary of any such reductions. Seller further agrees to defend and hold harmless Seller for any actions contemplated by this Section.

**5.4. Correctness of Representations.** No representation or warranty of Seller in this Agreement or any other information furnished by Seller pursuant to this Agreement contains any untrue statement of material fact or fails to state any fact necessary in order to make the statements not misleading in any material respect. All statements, representations, and other information provided by Seller to Buyer shall be true and correct on and as of the Closing Date as though made on that date.

## ARTICLE 6.
## REPRESENTATIONS AND WARRANTIES OF BUYER

**6.1. Buyer's Representations and Warranties.** Buyer makes the following representations and warranties to Seller, each of which is true and correct as of the date of this Agreement and shall be true and correct as of the Closing Date:

(a) Buyer is a California Corporation, duly organized, validly existing, and in good standing under the laws of the state of its organization, and is qualified to transact business in the State of California.

(b) Buyer has full legal power and authority to enter into and perform this Agreement, and this Agreement constitutes the valid and binding obligation of Buyer, enforceable in accordance with its terms.

(c) The execution and delivery of this Agreement does not conflict with, violate, or constitute a default under the terms, conditions, or provisions of any agreement or instrument to which Buyer is a party, or any law, judgment, or order of which Buyer is aware, and will not result in the creation of any lien, security interest, or encumbrance on any of the Assets.

(d) There is no action, proceeding, or claim pending, or, to Buyer's knowledge, threatened, against Buyer that would affect Buyer's ability to consummate the transactions contemplated by this Agreement.

(e) No consent, approval, or authorization of or declaration, filing, or registration with any governmental or regulatory authority is required in connection with the execution, delivery, and performance by Buyer of this Agreement or the consummation of the transactions contemplated by the

Agreement.

**6.2. Correctness of Representations.** No representation or warranty of Buyer in this Agreement or any other information furnished by Buyer pursuant to this Agreement contains any untrue statement of material fact or fails to state any fact necessary in order to make the statements not misleading in any material respect. All statements, representations, exhibits, and other information provided by Buyer to Seller shall be true and correct on and as of the Closing Date as though made on that date.

## ARTICLE 7.
## SELLER'S PRE-CLOSING OBLIGATIONS

**7.1. Maintenance of Property Pending Closing.** At all times prior to the Closing Date, Seller shall continue to maintain the Assets and conduct its operation of the Business in the same manner as they have been maintained and operated by Seller prior to the execution of this Agreement.

**7.2. Access and Information.** Seller shall promptly provide Buyer with all information concerning the Business and the Assets that Buyer may reasonably request, and Buyer and its accountants and other representatives shall have access during normal business hours to all of the Assets in any way related to this and to the books and records thereof

**7.3. Consents.** On or before the Closing Date, Seller, at its expense, shall obtain all necessary consents required to assign Seller's interest in any of the Assets to Buyer as contemplated by this Agreement. In the event Seller is unable to obtain any such consent on or before the Closing Date, Buyer may terminate this Agreement as provided in Article 12.

**7.4. Discharge of Liens.** All liens, claims, charges, security interests, pledges, assignments, or encumbrances relating to the Assets that are not Permitted Liens shall be satisfied, terminated, and discharged by Seller on or prior to the Closing Date and evidence reasonably satisfactory to Buyer and its counsel of the satisfaction, termination, and discharge shall be delivered to Buyer at or prior to the Closing including but not limited to the obligation specifically identified in section 4.2 (f) of this agreement.

**7.5 Notice to Seller's Customers.** Seller shall arrange for the written notice to all existing customers, vendors and other interested parties, informing them of the change in the distribution rights and ownership of the assets and other property referenced in this agreement.

**7.6 Assignment of Contracts, Licenses and Intellectual Property.** Seller shall execute all documents and facilitate in the execution of all contemporaneous documents associated with the transfer of all third party agreement related to this transaction.

**7.7. Employee Matters.** Corrie Richards, ("Richards")who is currently an employee of Seller, shall be retained by Robanda as a salaried "at will" employee as defined by the California Labor Code. Buyer will assume payment of Richards' current salary of Seventy-Five Thousand Dollars ($75,000.00) per year. Additionally, Buyer shall assume responsibility commencing December 1, 2008 for any additional compensation, which may include taxes, insurance, and other benefits and amounts relating to Richards. Currently these include (1) a auto lease payment for 2009 Toyota Camry in the amount of $292.64 per month, (2) health insurance benefits commensurate with her current coverage, and (3) cellular phone service.

  7.7.1 Seller shall indemnify and hold Buyer harmless from any claims made against Buyer

with respect to Sellers other Employee obligations. Buyer shall not assume or in any way become responsible or liable for any compensation, taxes, insurance, or other benefits and amounts payable by Seller on account of any of its employees, excluding Richards referenced in Section 7.7 herein..

## ARTICLE 8.

### MUTUAL COVENANTS

**8.1. Further Assurances Prior to Closing.** Seller and Buyer shall, prior to Closing, execute any and all documents and perform any and all acts reasonably necessary, incidental, or appropriate to effect the transactions contemplated by this Agreement.

**8.2. Notification of Changed Circumstances.** At any time after the Execution Date and prior to the Closing, if either party becomes aware of any fact or circumstance that would materially change a representation or warranty made under this Agreement, the party with knowledge of those facts shall notify the other in writing as soon as possible after the discovery of the changed circumstances.

**8.3. Waiver of Compliance with Bulk Sales Law.** Buyer waives compliance with the provisions of Division 6 of the California Uniform Commercial Code relating to bulk transfers in connection with the transactions contemplated by this Agreement. Seller agrees to indemnify and hold Buyer harmless from any and all costs arising as a result of the waiver, including reasonable attorney fees and expenses that may be incurred by Buyer in any legal proceedings instituted or threatened as a result of the waiver.

**8.4. Broker's Fees.** Each party represents and warrants that no broker, finder, or any other person or entity has any claim for any brokerage commissions or fees in connection with any of the transactions contemplated by this Agreement. Each party shall indemnify the other against any claim or loss suffered as a result of any claim for brokerage commissions or fees payable, or claimed to be payable, on the basis of any actions in connection with this Agreement.

## ARTICLE 9.
### CONDITIONS PRECEDENT TO OBLIGATIONS OF BUYER

**9.1. Buyer's Conditions.** The obligation of Buyer to consummate the transactions contemplated by this Agreement shall be subject to the satisfaction, on or before the Closing Date, of each of the following conditions:

(a) The representations and warranties of Seller set forth in Article 5 shall be true and correct as of the Closing Date.

(b) Seller shall have performed and complied with all of the agreements, covenants, and conditions required of Seller by this Agreement on or before the Closing Date.

(c) No action, suit, or proceeding before any court or any governmental body or authority that would in any way affect the Assets or the ability of the parties to consummate the transactions contemplated by this Agreement shall have been instituted or threatened on or before the Closing Date.

(d) The Assets shall be subject to inspection upon receipt by Buyer. The Assets shall be in substantially the same condition on the Closing Date as on the Execution Date, and there shall be no loss or damage to the property prior to the Closing.

(e) Seller shall have obtained all necessary agreements and consents of any parties required to consummate the transactions contemplated by this Agreement.

(f) Buyer shall have received corporation tax clearance certificates from the Florida State Sales Tax Department (with respect to Seller's sales and use tax liabilities) and the Florida State Employment Tax Department (with respect to Seller's employment tax obligations), as well as any other relevant taxing agencies as of December 1, 2008.

(g) Buyer shall have received a Certificate of Release from Presidential Financial Corporation stating that, as of December 2, 2008 , no contributions, interest, or penalties are due from Seller and that all existing liens on Seller's inventory has been terminated.

**9.2. Non-Circumvention.** Seller agrees that Seller will not disrupt, damage, impair or interfere with the business of Buyer by way of interfering with or disrupt Buyer's relationships with its customers, potential customers, agents, vendors, representatives or otherwise. Seller further agrees that Seller will not, directly or indirectly, for Seller or on behalf of, or in conjunction with any other person, firm, partnership, corporation or entity, divert or take away or attempt to divert or take away, call on or solicit or attempt to solicit the business or patronage of any of Buyer's customers, patrons and/or suppliers, existing or potential.

**9.3. Further Assurances; Further Assistance.** Seller and Buyer shall, without charge to each other, after Closing, execute and deliver or cause to be executed and delivered to the other, such further instruments, documents and conveyances and shall take such other action as may be reasonably required to more effectively carry out the terms and provisions of this Agreement. Such further instruments, documents and conveyances shall be in form and substance acceptable to Buyer and Seller. Further, Seller shall provide Buyer with any information or support requested by Buyer regarding various aspects of the Assets, as related to this transaction, at no charge or cost to Buyer, commencing upon execution of this Agreement and continuing until six (6) months following Closing. Upon Buyer's request Seller shall provide such support by making available the person(s) most knowledgeable about the Assets and the operation thereof for telephonic consultation, and for periodic meetings with BAI. Additionally, Seller shall exercise its best efforts in identifying its sales terms, product pricing and discounting policies and procedures as previously utilized by Seller.

**9.4. Failure to Satisfy Buyer's Conditions.** Any of Buyer's conditions precedent may be waived in whole or in part by Buyer in writing at any time on or before the Closing Date. In the event all Buyer's conditions precedent have not been waived by Buyer or satisfied in full on or before the Closing Date, Buyer may elect to terminate this Agreement as provided in Article 12.

### ARTICLE 10.
### CONDITIONS PRECEDENT TO OBLIGATIONS OF SELLER

**10.1. Seller's Conditions.** The obligation of Seller to consummate the transactions contemplated by this Agreement shall be subject to the satisfaction, on or before the Closing Date, of each of the following conditions:

(a) The representations and warranties of Buyer set forth in Article 6 shall be true and correct as of the Closing Date.

(b) Buyer shall have performed and complied with all of the agreements, covenants, and

conditions required of Buyer by this Agreement on or before the Closing Date.

**10.2. Failure to Satisfy Seller's Conditions.** Any of Seller's conditions precedent may be waived in whole or in part by Seller in writing at any time on or before the Closing Date. In the event all Seller's conditions precedent have not been waived by Seller or satisfied in full on or before the Closing Date, Seller may elect to terminate this Agreement as provided in Article 12.

## ARTICLE 11.
## POST-CLOSING OBLIGATIONS

**11.1. Additional Assurances.** Each party agrees to do all acts and things and to make, execute, and deliver such written instruments as shall be reasonably necessary to carry out the terms and provisions of this Agreement. This covenant of further assurances shall survive the Closing.

**11.2. Inventory Exceptions.** In addition to the inventory as described in Schedule 1 attached, Buyer shall ship to Seller the products referred to generally as the Kaliente Line listed as Schedule 7 attached is currently valued at $26,663.50 . The parties agree that Buyer shall take possession of this product line and shall make their best effort to sell such inventory. When the inventory is sold, Buyer shall compensate Seller each calendar quarter based on the commission amounts as described in the Services Contract and executed by Seller in conjunction with this agreement. Seller shall have no obligation to sell this inventory and any unsold product may be returned to Seller, at Sellers expenses at any time during the term of this transaction. Seller shall not pay Buyer for the storage nor holding of this product line, and upon the request of Seller shall return to Seller, at Sellers expense, all unsold portions of this Kaliente Line. Based on the mutual agreement of the Parties, Buyer may also return any inventory to Seller, if for any reason Seller disagrees with the intended discounts.

**11.2. Covenant Not to Compete.** Seller agrees that it shall not engage, directly or indirectly, in any business that is the same as or similar to the Business for a period of five (5) years, or until such time as Buyer ceases to operate a like business, whichever occurs first.

## ARTICLE 12.
## TERMINATION

**12.1. Termination.** This Agreement may be terminated as follows:

(a) By the mutual consent of Buyer and Seller at any time prior to the Closing.

(b) By Buyer at any time prior to the Closing as expressly provided in this Agreement, or if any condition precedent to Buyer's obligations set forth in Article 9 has not been satisfied in full or previously waived by Buyer in writing, at or prior to the Closing.

(c) By Seller at any time prior to the Closing as expressly provided in this Agreement, or if any condition precedent to Seller's obligations set forth in Article 10 has not been satisfied in full or previously waived by Buyer in writing, at or prior to the Closing.

(d) By either party if the Closing has not occurred on or before December 10, 2008.

**12.2. Effect of Termination.** In the event of the termination of this Agreement pursuant to the provisions of this Article 12, this Agreement shall become void and have no effect, without any liability on the part of any of the parties.

**12.3. Remedies Cumulative.** The remedies set forth in this Agreement are cumulative and not exclusive of any other legal or equitable remedy otherwise available to any party.

## ARTICLE 13.
## INDEMNIFICATION

**13.1. Seller's Indemnification.** In addition to any other agreement on the part of Seller to indemnify Buyer set forth in this Agreement, Seller shall indemnify and hold Buyer harmless from and against any and all loss, cost, damage, claim, liability, or expense, including reasonable attorney fees and costs, in any way arising from or related to (a) Seller's ownership or use of the Assets, or Seller's operation of the Business, prior to the Closing Date, (b) the failure or falsity of any representation or warranty of Seller contained in this Agreement, or (c) the failure by Seller to observe or perform any other covenant or agreement to be observed or performed by Seller under this Agreement.

**13.2. Buyer's Indemnification.** In addition to any other agreement on the part of Buyer to indemnify Seller set forth in this Agreement, Buyer shall indemnify and hold Seller harmless from and against any and all loss, cost, damage, claim, liability, or expense, including reasonable attorney fees and costs, in any way arising from or related to Buyer's ownership or use of the Assets from and after the Closing Date.

**13.3. Survival of Indemnities.** The mutual agreements to indemnify set forth in this Article 13 shall survive the Closing.

## ARTICLE 14.
## GENERAL PROVISIONS

**14.1. Assignment.** The respective rights and obligations of the parties to this Agreement may not be assigned by any party without the prior written consent of the other, which consent may not be unreasonably withheld or delayed.

**14.2. Successors and Assigns.** The terms and provisions of this Agreement shall be binding on and inure to the benefit of the successors and assigns of the parties.

**14.3. Entire Agreement.** This Agreement constitutes the entire agreement between the parties with respect to the subject matter of this Agreement and supersedes all prior agreements, oral and written, between the parties hereto with respect to the subject matter of this Agreement.

**14.4. Modification and Waiver.** This Agreement may not be amended, modified, or supplemented except by written agreement signed by the party against which the enforcement of the amendment, modification, or supplement is sought. No waiver of any of the provisions of this Agreement shall be deemed, or shall constitute, a waiver of any other provision. No waiver shall be binding unless executed in writing by the party making the waiver.

**14.5. Attorney Fees.** If any legal action or other proceeding is brought to enforce the provisions of this Agreement, the prevailing party shall be entitled to recover reasonable attorney fees and other costs incurred in the action or proceeding, in addition to any other relief to which the prevailing party may be entitled.

**14.6. Fees and Expenses.** Except as otherwise specifically provided in this Agreement, Seller and Buyer shall pay their own fees and expenses in connection with the negotiation and consummation of the



transactions contemplated by this Agreement. The parties further agree that the legal fees for the drafting of this agreement and related documents shall be equally shared.

**14.7. Notices.** All notices, requests, demands, and other communications required by this Agreement shall be in writing and shall be (a) delivered in person or by courier, (b) mailed by first class registered or certified mail, or (c) delivered by facsimile transmission, as follows, or to such other address as a party may designate to the other in writing:

(i) If to Seller: Camelot
c/o Anthony J. Parkinson
~~1900 NE Cheri Dr.~~ Box 400
~~Jensen Beach, FL 34957~~ Jensen 34958
~~Miami, FL 33122~~ Beach, FL

(ii) If to Buyer:
David Leib
Robanda International
1245 Knoxville St
San Diego, CA 92110

With a courtesy copy to:
LAW OFFICES OF DIANA CIMINO
352 Third Street Suite 308
Laguna Beach, CA 92651

If delivered personally or by courier, the date on which the notice, request, instruction, or document is delivered shall be the date on which the delivery is made, and if delivered by facsimile transmission or mail as aforesaid, the date on which the notice, request, instruction, or document is received shall be the date of delivery.

**14.8. Headings.** All section headings contained in this Agreement are for convenience of reference only, do not form a part of this Agreement, and shall not affect in any way the meaning or interpretation of this Agreement.

**14.9. Interpretation.** This Agreement has been negotiated at arm's length between persons knowledgeable in the matters addressed herein. Each Party hereby represents that he, she or it has been represented or had the opportunity to be represented by experienced and knowledgeable legal counsel. Accordingly, any rule of law, including without limitation, Civil Code section 1654, or any other statutes, legal decisions or common law principles of similar effect, which would require interpretation of any ambiguities in this Agreement against the party that has drafted it is of no application and is hereby expressly waived.

**14.10. Arbitration.** Any claim, dispute or controversy arising out of or in connection with or relating to this Agreement or the breach or alleged breach thereof shall be submitted by the Parties to binding arbitration before a mutually agreeable arbitrator. In the event the Parties are unable to agree upon an arbitrator, then any and all claims, disputes or controversies arising out of or in connection with or relating to this Agreement or the breach or alleged breach thereof shall be submitted by the Parties to binding arbitration before and according to the Commercial Arbitration Rules of the American Arbitration Association ("AAA") before the AAA offices in San Diego, California by a single arbitrator. All awards

Asset Purchase Agreement
Buyer: Robanda International
Seller: Camelot Hair Care Products, LLC
Page 11 of 13
November 29, 2008 (draft 4)



of the arbitrator shall be binding and nonappealable. Judgment upon the award of the arbitrator may be entered in any court having jurisdiction. The prevailing party in any arbitration shall be entitled to receive his reasonable attorney's fees and costs as awarded by the arbitrator. All parties to this Agreement shall be entitled to the benefits provided by California Code of Civil Procedure section 1283.05 in any arbitration proceeding.

**14.11. Counterparts.** This Agreement may be executed in two (2) or more counterparts, all of which shall be considered one and the same agreement, and shall become effective when one counterpart has been signed by each party and delivered to the other party hereto.

**14.12. Time of Essence.** Time shall be of the essence with respect to the obligations of the parties to this Agreement.

**14.13. Governing Law.** This Agreement shall be governed by and construed under the laws of the State of California.

**14.14. Severability.** In the event any provision of this Agreement is deemed to be invalid, illegal, or unenforceable, all other provisions of the Agreement that are not affected by the invalidity, illegality, or unenforceability shall remain in full force and effect.

IN WITNESS WHEREOF, the parties have executed this Agreement as of the date of this Agreement.

**SELLER:**
CAMELOT HAIR CARE PRODUCTS,
A Florida Limited Liability Company

_____       Date 2/17/09
Anthony J. Parkinson
~~President~~ Manager

**BUYER:**
ROBANDA INTERNATIONAL, INC.,
a California Corporation

_____       Date 3/20/09
David Leib,
President

EXHIBIT "B"

*12/6/08*
*DAVID*
*For your file*
*Tony*

Nina T Parkinson
9014 Ashcroft Avenue
West Hollywood, CA 90048

December 1st, 2008

David Leib
Robanda International
San Diego, CA

Use of Marilyn Trademark: US Registration # 2,723,910

Dear Mr Leib,

This letter will authorize you to have the complete and free use of the Marilyn® trademark for a period of 5 years from this date without compensation or consideration paid to me as its registered owner.

You have purchased the inventory and goodwill of the Marilyn brand from Camelot and entered into an arrangement to use the services of Tony Parkinson for a period of 5 years from this date under which he is compensated at the rate of 10% of Net Invoice payable quarterly. Upon the final payment made to Mr. Parkinson, I will immediately assign and transfer the trademark to Robanda.

During the 5 year period precedent to your ownership of the mark, I will expect that you will maintain proper control over the products on which this mark is used in regards to quality and efficacy. The brand can never be considered anything but a first class product with high integrity and "customer is always right" support. In order to fulfill these requirements, you will provide me with samples for review every 6 months so that I may verify the manner in which the mark is used and the quality of the product on which it is affixed.

The mark maybe used on any and all products in the beauty field, although it is incumbent upon you to provide prototypes and promotional information on any new products for my review and comment prior to release. If something is in bad taste I reserve the right to make this known and expect that you will take the appropriate corrective action.

You have my full trust and endorsement and I look forward to seeing the brand expand both geographically as well as physically.

Yours faithfully,

Nina T Parkinson

EXHIBIT "C"

```
FROM : VANDUX DE COLO~~~~, A.        PHONE NO. : 57 5 3536851        MAR. 09 2004 12:17PM P1
  By:-FKGSB*FTL..KAIN;                054 708 0158;         Mar-9-04 10:38AM;        Page 3/3
```

## ASSIGNMENT

WHEREAS, Plasticos Vandux do Columbia S.A., a Colombian corporation, with a principal place of business at Via 40 No. 79B-145, Barranquilla Colombia, is the owner of the trademark MARILYN with a stylized I, registered in the United States under Certificate No. 2,723,910 on June 10, 2003; and

WHEREAS, Camelot Hair Care Products, LLC, a Florida limited liability corporation, having a principal place of business at 2080 N.W. 79th Avenue, Miami, Florida 33122 is desirous of acquiring said registered trademark.

NOW, THEREFORE, in consideration of the sum of Ten ($10.00) Dollar and other good and valuable consideration, the receipt of which is hereby acknowledged, Plastics Vandux de Colombia S.A. hereby assigns to Camelot Hair Care Products, LLC all right, title and interest in the United States in and to said trademark, Reg. No. 2,723,910, together with the goodwill of the business symbolized by said trademark and registration thereof.

Signed at **Barranquilla Col** this **9th** day of **March**, 2004

Plasticos Vandux de Colombia S.A.

By: _Alberto Lee Bigio_
Alberto Lee Bigio,
Title: **President**

FK-000397

EXHIBIT "D"

## Schedule A

### TRADEMARK ASSIGNMENT

WHEREAS, Camelot Hair Care Products, LLC, a limited liability company of the State of Florida, having a place of business at 4304 South US 1, Fort Pierce, Florida 34982 (the "Assignor"), has adopted and used in commerce the trademark MARILYN (the "Trademark") and is the owner of U.S. Registration No. 2,723,910 (the "Registration") used in connection with hair brushes in International Class 21 of the Trademark; and

WHEREAS, Nina T. Parkinson, an individual, whose mailing address is 9014 Ashcroft Avenue, West Hollywood, California 90048-1705 (the "Assignee"), is desirous of acquiring all rights, title and interests in and to the Trademark and Registration, and the good will associated therewith.

NOW, THEREFORE, in consideration of good and valuable consideration, the receipt and sufficiency of which is acknowledged, effective as of September 30, 2008 by this document, Assignor sells, assigns, conveys and transfers to the Assignee, all rights, title and interests in and to the Trademark and Registration and any renewals thereof, in and to all good will symbolized by and associated with the business conducted under the Trademark, the right to recover for damages and profits and all other remedies for past infringement based on such Trademark, and the benefit of any rights at common law that have accrued to the Assignor through the use of the Trademark or otherwise.

Camelot Hair Care Products, LLC:

By: _____
Authorized Representative

Print Name: ANTHONY PARKINSON

Title: Managing Member


STATE OF FLORIDA
COUNTY OF ST LUCIE

On this 1st day of October, 2008, Anthony Parkinson of Camelot Hair Care Products, LLC personally appeared before me, who is personally known to me or whose identity I proved on the basis of FL DL P625-010-73-36 P- and being duly sworn, averred that, being duly authorized, (s)he executed the foregoing Assignment as the free act and deed of said corporation for the uses and purposes set forth.

NOTARY PUBLIC
My Commission expires:

SEAL
DONNA M. GREENE
Notary Public - State of Florida
My Commission Expires Nov 7, 2008
Commission # DD 367647
Bonded By National Notary Assn.